COURT OF APPEALS

                                       SECOND DISTRICT OF TEXAS

                                                   FORT WORTH

 

 

                                        NO.
2-09-125-CV

 

 

IN THE INTEREST OF S.A.G., 

E.J.G., AND
N.S.G., CHILDREN                                                              

 

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

Introduction








Appellant
A.G. appeals the trial court=s order
terminating her parental rights to her children S.A.G., E.J.G., and N.S.G.[2]  In two points, A.G. contends that the
evidence presented at trial was legally and factually insufficient to support
two of the trial court=s three statutory termination
findings and was factually insufficient to prove that termination of the
parent-child relationship was in the children=s best
interests.  See Tex. Fam. Code
Ann. ' 161.001(1)(D),
(E), (M) & (2) (Vernon Supp. 2009). 
We affirm.

Background
Facts

Appellant
A.G. (Mother) is the biological mother, and her husband C.S.G. (Father) is the
presumed biological father, of S.A.G., E.J.G., and N.S.G., the three children
who are the subject of this suit.  Mother
and Father were married on March 20, 2005. 
Daughter S.A.G. was born on August 18, 2005, son E.J.G. was born on June
8, 2006, and son N.S.G. was born on September 22, 2008, after this suit had
been filed.








In March
2008, the Texas Department of Family and Protective Services (the Department)
received allegations that Mother and Father had neglectfully supervised and
physically abused S.A.G. and E.J.G.  A
Department caseworker investigated and observed S.A.G. and E.J.G. strapped to
and hanging over their high chairs, screaming and crying.  Mother admitted to the caseworker that she
had left both children in their high chairs while she and Father slept and that
she has screamed and cursed at the children. 
Mother told the caseworker that she was not able to care for S.A.G. and
E.J.G. at their current ages but that she was able to take care of babies.  Mother was the children=s sole
care provider for six to eight hours per day while Father worked outside the
home as a driver and helper at Pizza Hut.

Mother=s
extensive history with the Department began when she was a child.  In 1988, Mother was removed from her mother
and placed in foster care after being physically abused by her mother and
sexually abused by her mother=s
boyfriends.  Mother became involved with
the Department in 2000 regarding her own children.  In November 2003, a court involuntarily
terminated Mother=s parental rights to her third
child, born in April 2003, based on child endangerment findings under Texas
Family Code section 161.001(1)(D), (E), and (N).  Mother testified that she was dealing with Amental
issues@ at the
time, was not taking her medications, and alternated between living on the
streets and in her own apartment.

The
Department removed S.A.G. and E.J.G. from Mother and Father=s home,
placed them in foster care, and filed suit in April 2008 for the children=s
protection, for temporary managing conservatorship, and for termination of
Mother=s and
Father=s
parental rights.








In
September 2008, N.S.G. was born prematurely at thirty-three weeks. The
Department became involved with N.S.G. because S.A.G. and E.J.G. had been
removed and due to concerns about Mother=s abuse
of prescription medications.  At the
time, Mother was taking hydrocodone[3]
every four to six hours for back pain and Tegretol for her seizure and bipolar
disorders.  During the investigation,
Mother reported that a nurse had been concerned with her abuse of hydrocodone
during her pregnancy, but Mother denied the abuse. Mother also stated that
Tegretol caused sleepiness, and that she planned to use a baby monitor to hear
the baby crying and an alarm clock to time her naps while the baby was
sleeping.  Also during the Department=s
investigation, Mother admitted that she and others called law enforcement to
her home approximately twenty to thirty times due to arguments with her
husband, among other reasons.

At the
end of its investigation regarding N.S.G., the Department found reason to
believe the allegation of neglectful supervision but ruled out the allegation
of physical neglect.  The Department
amended its petition regarding S.A.G. and E.J.G. to add N.S.G.  Upon Father=s
motion, the trial court ordered S.A.G., E.J.G., and N.S.G. placed with the
children=s
paternal grandmother, M.L.








In June
2008, the trial court approved and adopted the Department=s
service plan for Mother and Father. 
Under the service plan, Mother and Father were required to maintain safe
and appropriate housing, submit to a screening conducted by the Texas Mental
Health and Mental Retardation (MHMR) Department and follow all recommendations
from the screening, attend couples=
counseling sessions and parenting classes, submit to random drug screenings,
participate in a psychological evaluation and follow all recommendations from
the evaluation, and visit the children weekly.

Child
Protective Services (CPS) ongoing caseworker Elizabeth Bowlen reviewed Mother=s
service plan with her on multiple occasions. 
Although Mother began parenting classes, she did not complete them
because she was unable to make her appointments while in the hospital giving
birth to N.S.G. Mother completed her MHMR screening and MHMR made no
recommendations. Mother and Father maintained safe and appropriate housing.  They both attended couples=
counseling sessions and submitted to random drug screenings when requested and
no illegal drug use was indicated. 
Mother also participated in a psychological evaluation as required under
her service plan.  Following the
psychological evaluation, Bowlen met with Mother and encouraged her to continue
to attend therapy to address issues surrounding the abuse and neglect Mother
experienced as a child and to address anger management issues.








In November
2008, after N.S.G.=s birth, Mother told Bowlen on
two separate occasions that she might want to relinquish her parental rights to
the children because she did not think that she could care for them.  Mother maintained her opposition to
termination, however, based on her belief that she and her children deserved to
be together as a family.  Also in
November 2008, Mother called Bowlen stating that she had sought help with
postpartum depression at the Women=s Center
but that the doctor would not prescribe her medication.

On
February 9, 2009, approximately one month before trial, Mother sought treatment
at Parkland Hospital in Dallas after being referred there by her
neurologist.  At Parkland, she was told
that her blackouts were caused by psychotic episodes, not epilepsy as
previously diagnosed.  After receiving
this revised diagnosis, Mother thought about taking her life by driving Father=s car into
the river but changed her mind because she loved her children and believed they
and Father needed her.  Mother did not
seek mental health services following her thoughts of suicide, and she
disagreed with the diagnosis that she was suffering from depression at the time
of trial.








This
case was tried to the bench on March 10, 2009. 
The evidence indicated that, in addition to the diagnosis of having
blackouts caused by psychotic episodes, Mother previously had been diagnosed
with bipolar disorder, sleep disorder, depression accompanied by thoughts of
suicide, scoliosis, asthma, high blood pressure, a heart murmur, and
seizures.  At the time of trial Mother
was taking Cymbalta for depression and bipolar disorder, Ambian CR for a sleep
disorder, Albuterol for asthma, and high blood pressure medication.  Mother testified that she had been prescribed
Tegretol and Keppra for seizures in the past but that she no longer was
diagnosed with a seizure disorder and was no longer taking seizure medication.  Mother also had taken prescription
hydrocodone, Ibuprofen, Tylenol, and Excedrin for pain management, Zoloft,
Paxil, Depakote, Dilantin, and Pulmicort.

Father
testified that Mother=s IQ is not very high.[4]  Mother admitted problems with memory lapses,
but she did not recall when they began. 
She stated that her memory problems did not affect her parenting and
that she has never forgotten to feed her children or change their diapers.  Mother reported becoming agitated during her
psychological evaluation because she was not able to remember instructions and
perform the assigned tasks.








Mother
admitted that she experienced blackouts, but disagreed with the diagnosis that
they were caused by psychotic episodes. 
She did not recall blacking out while caring for S.A.G. and E.J.G. by
herself.  Mother also testified that she
only knew when she had blacked out if Father told her, and that otherwise she
was not aware of blacking out in the past. 
Mother stated that her blackout spells would not impact her ability to
take care of her three children because she would be able to rely upon Father=s
support.

Mother
testified that she has been depressed in the past and that she had fallen short
as a parent due to her depression; specifically, she had yelled and cussed at
her children.  Mother testified that she
was working on this issue and doing better.

Mother
denied abusing prescription drugs, stating that she always took her medication
as prescribed.  She testified that she
had a history of taking hydrocodone as frequently as every four to six hours
for back pain.  Mother admitted that, in
the months before trial, she had obtained more than three prescriptions for
hydrocodone for her back pain and finished a one-month supply of hydrocodone in
fifteen days.  Mother also stated that
she discussed this case with her family physician, and he stated that they
would Alower
[her] medication to where [she is] more stable enough to care for the children@ if they
were returned to her.








Father
never knew Mother to harm the children and had no concerns about her ability to
provide for their physical needs.  He
stated, however, that he thought she was in need of counseling for depression
as recently as one month before trial. 
Father also stated that, if the children were returned to him and
Mother, he would seek help from a nanny so that they can work themselves back
into caring for small children.  Mother
also told the court that she would prefer to have a nanny with her when her
husband was at work.

At
trial, the Department also introduced a certified copy of the November 2003 order
of termination of Mother=s parental rights to her
third-born child, K.L.J.  Mother=s rights
to K.L.J. were terminated involuntarily upon court findings that Mother had
knowingly placed or knowingly allowed her to remain in conditions or
surroundings which endangered her physical or emotional well‑being,
engaged in conduct or knowingly placed her with persons who engaged in conduct
which endangered her physical or emotional well‑being, and constructively
abandoned her.[5]  See Tex. Fam. Code Ann. '
161.001(1)(D), (E), & (N) (Vernon 2008 & Supp. 2009).








At the
end of this trial, the court terminated Mother=s
parental relationship with the children.[6]  The trial court found that Mother (1) knowingly
placed or knowingly allowed the children to remain in conditions or
surroundings which endangered their physical or emotional well‑being, (2)
engaged in conduct or knowingly placed the children with persons who engaged in
conduct which endangered their physical or emotional well‑being, and (3)
had previously had her parent‑child relationship terminated with respect
to another child based on an adverse finding regarding these previous two
standards.  Id. ' 161.001(1)(D),
(E), & (M).  The court also found
that termination of Mother=s
parental relationship with the children was in their best interests.  Id. ' 161.001(2).  The court named the Department managing
conservator, Father joint possessory conservator with right of reasonable
access and possession, and M.L. and C.L. (Father=s
parents) joint possessory conservators with primary right of possession.  The trial court also ordered Father, M.L.,
and C.L. not to allow Mother to have contact with the children or allow the
children to enter Father=s residence while he resided
with Mother.  Mother timely filed this appeal.

Standard of Review








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re M.C.T., 250
S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).

In
proceedings to terminate the parent‑child relationship brought under
section 161.001 of the family code, the petitioner must establish one ground
listed under subsection (1) of the statute and must also prove that termination
is in the best interest of the child. 
Tex. Fam. Code Ann. '
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).








Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. ''
161.001, 161.206(a) (Vernon 2008). Evidence is clear and convincing if it Awill
produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established.@  Id. ' 101.007
(Vernon 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In
re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).

Endangerment

In her
first issue, Mother contends that the evidence is legally and factually
insufficient to support the trial court=s
endangerment findings under subsections 161.001(1)(D) and (E) of the Texas
Family Code.








Along
with a best interest finding, a finding of only one ground alleged under family
code section 161.001(1) is sufficient to support a judgment of
termination.  In re E.M.N., 221
S.W.3d 815, 821 (Tex. App.CFort
Worth 2007, no pet.).  Although Mother appeals
the court=s findings under subsections (D)
and (E), she fails to challenge its finding under subsection (M) that her
parental rights to a different child had previously been terminated under
subsection (D) or (E).  The record
includes a certified copy of the November 25, 2003, Order of Termination of
Mother=s
parental rights to K.L.J., the children=s
half-sister, based on endangerment findings under subsections (D), (E), and
(N). Therefore, we hold that the trial court had a legally sufficient basis to
support termination under section 161.001(1)(M), and we need not address
Mothers=
challenge to the findings under (D) and (E). 
See Fletcher v. Dep=t of
Family & Protective Servs., 277 S.W.3d 58, 64 (Tex. App.CHouston
[1st Dist.] 2009, no pet.); see also In re B.K.D., 131 S.W.3d 10, 16
(Tex. App.CFort Worth 2003, pet. denied)
(explaining that Ato be successful on appeal, the
appellant must establish that the . . . findings on all of
the [Department=s] pleaded grounds are
unsupported by the evidence@); Green
v. Tex. Dep=t of Protective & Regulatory
Servs., 25 S.W.3d 213, 219 (Tex. App.CEl Paso
2000, no pet.) (holding that, because the appellant Afailed
to challenge the legal or factual sufficiency of the evidence with regard to
[one of the statutory provisions], the first element of involuntary termination
c[ould] be affirmed based on th[at] provision@).  We overrule Mother=s first
issue.

Best
Interests of the Children

In her
second issue, Mother contends that the evidence is factually insufficient to
support the trial court=s finding that termination of
her parental rights was in the children=s the
best interests under subsection 161.001(2) of the Texas Family Code.








Factual Sufficiency Review

In
reviewing the evidence for factual sufficiency, we must give due deference to
the factfinder=s findings and not supplant the
judgment with our own.  In re H.R.M.,
209 S.W.3d 105, 108 (Tex. 2006).  We must
determine whether, on the entire record, a factfinder could reasonably form a
firm conviction or belief that the parent violated at least one conduct
provision of section 161.001(1) and that the termination of the parent-child
relationship would be in the best interest of the child.  Tex. Fam. Code Ann. '
161.001; C.H., 89 S.W.3d at 28. 
If, in light of the entire record, the disputed evidence that a
reasonable factfinder could not have credited in favor of the finding is so
significant that a factfinder could not reasonably have formed a firm belief or
conviction in the truth of its finding, then the evidence is factually
insufficient. H.R.M., 209 S.W.3d at 108.

Best
Interest Factors

There is
a strong presumption that keeping a child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child=s best interest.  Tex. Fam. Code Ann. ' 263.307(a)
(Vernon 2008).  The following factors
should be considered in evaluating the parent=s
willingness and ability to provide the child with a safe environment:








(1) the child=s age and physical and mental vulnerabilities;

 

(2) the frequency and nature of out‑of‑home
placements;

 

(3) the magnitude, frequency, and circumstances
of the harm to the child;

 

(4) whether the child has been the victim of
repeated harm after the initial report and intervention by the department or
other agency;

 

(5) whether the child is fearful of living in or
returning to the child=s home;

 

(6) the results of psychiatric, psychological, or
developmental evaluations of the child, the child=s parents, other family
members, or others who have access to the child=s home;

 

(7) whether there is a history of abusive or
assaultive conduct by the child=s family or others who have access to the child=s home;

 

(8) whether there is a history of substance abuse
by the child=s family or others who
have access to the child=s home;

 

(9) whether the perpetrator of the harm to the
child is identified;

 

(10) the willingness and ability of the child=s family to seek out,
accept, and complete counseling services and to cooperate with and facilitate
an appropriate agency=s close supervision;

 

(11) the willingness and ability of the child=s family to effect
positive environmental and personal changes within a reasonable period of time;

 

(12) whether the child=s family demonstrates
adequate parenting skills, including providing the child and other children
under the family=s care with:








(A) minimally adequate health and nutritional
care;

 

(B) care, nurturance, and appropriate discipline
consistent with the child=s physical and
psychological development;

 

(C) guidance and supervision consistent with the
child=s safety;

 

(D) a safe physical home environment;

 

(E) protection from repeated exposure to violence
even though the violence may not be directed at the child;  and

 

(F) an understanding of the child=s needs and
capabilities;  and

 

(13) whether an adequate social support system
consisting of an extended family and friends is available to the child.

 

Id. ' 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)    the desires of the child;

 

(B)    the emotional and physical needs of the
child now and in the future;

 

(C)    the emotional and physical danger to the
child now and in the future;

 

(D)    the parental abilities of the individuals
seeking custody; 

 

(E)    the programs available to assist these
individuals to promote the best interest of the child;

 








(F)     the plans for the child by these
individuals or by the agency seeking custody;

 

(G)    the stability of the home or proposed
placement;

 

(H)    the acts or omissions of the parent which may
indicate that the existing parent‑child relationship is not a proper one;
and

 

(I)     any excuse for the acts or omissions of the
parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976). 


 

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when
appropriate.  C.H., 89 S.W.3d at
27.  Furthermore, undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

Although
termination may not be based solely on the best interest of the child as
determined by the trier of fact, Boyd, 727 S.W.2d at 533, the same
evidence may prove both a subsection 161.001(1) endangerment finding and a
finding under subsection 161.001(2) that termination is in the best interest of
the child.  C.H., 89 S.W.3d at 28;
see Tex. Fam. Code Ann. '
161.001.








Analysis

Mother=s parental abilities

CPS
caseworker Bowlen testified that Mother and Father=s Aphysical
house was safe and appropriate.@  See Tex. Fam. Code Ann. '
263.307(b)(12)(D) (considering a parent=s
ability to provide a Asafe physical home environment@).  Father testified that he thought Mother was
an able parent, he never knew Mother to harm their children, and he had no
concerns about her ability to provide for their physical needs.  He handled most of the cooking, he and Mother
shared responsibilities for washing and bathing the children, and Mother was
disciplined about washing their clothes, sterilizing their bottles, and
measuring their bottles.








However,
evidence indicates that Mother did not demonstrate adequate parenting
skills.  See id. ' 263.307(b)(12);
Holley, 544 S.W.2d at 371B72.
Mother has a past history of not being able to provide her children with a safe
environment, as established by the termination of her parental rights to
another child based on endangerment and abandonment findings.  Mother also voluntarily relinquished her
parental rights to her first two children, in one instance because she did not
think that she could meet the child=s daily
needs. Additionally, Mother=s recent
history establishes that her parental abilities are deficient, including her
use of hydrocodone more frequently than prescribed and the fact that she told a
Department caseworker that she had left both children in their high chairs
while she and Father slept, that she screamed and cursed at the children, and
that she was not able to care for S.A.G. and E.J.G. at their current ages.

Mother
also failed to take steps toward improving her parenting skills by completing
the parenting classes required under her service plan.  According to Father, Mother=s
pregnancy with N.S.G. prevented her from attending the classes.  Neither Father nor Mother, however, offered any
reason why Mother was not able to resume and complete parenting classes in the
months between N.S.G.=s birth and the trial date.

Emotional and physical needs of
and danger to the children

Mother
admitted to having blackouts but stated that her blackouts would not impact her
ability to take care of her three children. 
However, the trial court reasonably could have concluded that Mother had
blacked out while acting as the children=s sole
care giver and that these occurrences put the children in danger.








Mother
told the court that she had thought about committing suicide in the weeks
before trial.  She also admitted that she
was depressed in the past and that she yelled and cussed at S.A.G. and E.J.G.
while dealing with her depression. 
Mother told the court that she was working on her yelling and cussing
and doing better.  Father testified that
Mother sometimes cussed when frustrated at the children but he did not think
Mother had a Aserious@ anger
management problem.

Mother
also had an ongoing pattern of memory problems that impacted her parenting in
the past.  Mother told the court that
there were a Alot of times@ when
Father reminded her of things she seemed to have forgotten.  She testified, however, that she has never
forgotten to feed her children or change their diapers when wet and that she
did not remember experiencing any problems remembering things regarding her
care for S.A.G. and E.J.G.  Yet Mother
voluntarily relinquished parental rights to her second-born child, J.J., after
she Aaccidently
forgot@ to give
him medication.  More recently, Mother
admitted that she became agitated and frustrated during her psychological
evaluation because she was not able to remember the instructions given and
perform the tasks assigned.








Mother
denied abusing prescription drugs. 
However, she told the court that she had a history of taking hydrocodone
as frequently as every four to six hours for back pain; that, in the months
before trial, she had obtained more than three prescriptions for hydrocodone
for her back pain; and that she finished one prescription for a month=s supply
of hydrocodone in fifteen days. Mother also reported that a nurse talked to her
about concerns that Mother abused hydrocodone while pregnant with N.S.G.








Mother
contends that there was no evidence introduced at trial that S.A.G., E.J.G., or
N.S.G. were harmed by her or as a result of her mental health issues.  The evidence indicated, however, that Mother=s
blackouts, thoughts of suicide, depression, memory problems, and prescription
drug use hindered her ability to care for the emotional and physical needs of,
and posed emotional and physical danger to, the children now and in the
future.  See Holley, 544 S.W.2d
371B72;
see also In re J.I.T.P., 99 S.W.3d 841, 845 (Tex. App.CHouston
[14th Dist.] 2003, no pet.) (A[T]he
trial court could have considered [the mother=s]
mental state [recurrent depression, thoughts of hurting herself, borderline
personality disorder, post‑traumatic stress disorder, attention deficit
hyperactivity disorder, and seizures] as endangering [the child=s] well‑being.@); In
re C.D., 664 S.W.2d 851, 853 (Tex. App.CFort
Worth 1984, no writ) (AWhile mental incompetence or
mental illness alone are not grounds for termination of the parent‑child
relationship, when a parent=s mental
state allows him to engage in conduct which endangers the physical or emotional
well‑being of the child, that conduct has bearing on the advisability of
terminating the parent=s rights.@); In
re E.A.W.S., No. 02‑06‑00031‑CV, 2006 WL 3525367, at *18
(Tex. App.CFort Worth Dec. 7, 2006, pet.
denied) (mem. op.) (holding that mother=s Ainstances
of mental instability and agitation, including threatening behavior and
suicidal ideation@ supported termination).

Any excuse for Mother=s acts
or omissions and Mother=s
willingness and ability to effect positive environmental and personal changes

Mother
did not offer any evidence by way of an excuse for her acts or omissions,
stating on appeal that her mental condition is involuntary.  See Holley, 544 S.W.2d 372.  Mother did not offer any excuse for her
history of failing to seek or accept assistance for her mental health condition
and repeatedly discounting the harm her mental condition posed to her children.  See
id.

Mother
has a history of refusing help for her mental condition. Approximately one year
before trial, Mother declined mental health services and medication offered by
Adult Protective Services (APS).  At
trial, Mother stated that she declined APS=s offer
because she did not feel that she would benefit from the services provided, but
that she later had come to regret that decision and that she Aprobably@ had
problems seeing after her own needs.








Mother
also showed a pattern of minimizing the severity of her own mental
condition.  She stated that she did not
believe she suffered from Apsychotic
spells@ despite
receiving that diagnosis approximately one month before trial.  And, although Mother contemplated suicide in
the weeks before trial, she said that she did not seek professional medical
attention afterward because, in her words, AI=ve been
told I=m crazy
and I=m not.@  Mother denied that she suffered from
depression at the time of trial.

Mother
also minimized the harm that her mental health condition had on the care she
was able to provide her children.  She
denied the possibility of ever blacking out while the children were in her
care.  Even though she admitted to memory
problems, Mother testified that she did not remember experiencing any problems
remembering things regarding her care for S.A.G. and E.J.G. and that she never
forgot to feed her children or change their diapers when wet.

Testimony
established that Mother had taken some steps to address her mental health
condition.  At the time of trial, Mother
was taking her depression, bipolar, and sleep disorder medication as prescribed
and had attended therapy sessions as part of her service plan.  But Mother did not accept that she was depressed
at the time of trial, did not seek help after contemplating suicide less than
one month before trial, did not accept that her blackouts were caused by
psychotic episodes as diagnosed, and did not take steps to address the danger
posed to her children in the event she blacked out while caring for them.
Accordingly, evidence supported the conclusion that Mother was unwilling and
unable to effect positive environmental and personal changes regarding her
mental health and parenting.  See Tex.
Fam. Code Ann. ' 263.307(b)(11).








Children=s
desires

The
children were three years, two years, and five months old at the time of the termination
trial and did not specifically express their desires.  Testimony at trial indicated that the older
two children had bonded with Mother and that Mother was working toward building
a bond with the youngest, N.S.G., despite the fact that they never lived
together.

Stability of the home

Evidence
indicated that Mother was not able to offer the children a stable home until
after receiving adequate mental health care. 
CPS caseworker Bowlen testified without objection that Mother had not
yet worked through issues of her own abuse and neglect as a child, that Mother
could not take care of small children without twenty-four-hour help, and that,
if Mother=s parental rights were not
terminated, she still probably would need Amany
years to work through a lot of her childhood issues@ before
being able to care for the children.

Plans for the children








Father
thought that, if the children were returned to him and Mother, they would seek
help from a nanny so that they could work themselves back into caring for small
children.  Mother similarly testified
that she would prefer to have a nanny with her when she cared for the children
while Father was at work.  Father stated
that they were able to afford paying a nanny $100 to $150 per week; Father
earned approximately $470 per week in wages plus tips.

The
Department planned to have the children=s
paternal grandparents, M.L. and C.L., eventually adopt all three children.  M.L. had agreed to take early retirement to
care for them.  Mother herself
recommended that M.L. adopt the children if Mother could not keep them, stating
that M.L. is a Avery good person and she=s been
doing it.@ 
Father also preferred that the children be placed with M.L. if they
could not be returned to him, and he was confident that M.L. was doing a good
job with them.

Our holding








On the
entire record and considering Mother=s
history of blackouts, her rejection of the diagnosis that they are caused by
psychotic episodes, her denial that she ever blacked out while caring for her
children, and her failure to address the danger to her children in the event
she blacks out while they are in her care; Mother=s
depression and thoughts of suicide less than one month before trial, her
failure to seek medical attention for depression and suicidal thoughts
thereafter, her refusal to accept the diagnosis that she was suffering from
depression at the time of trial, and the testimony from CPS caseworker Bowlen
that Mother may not be able to care for her children for some time even if she
diligently works toward addressing her mental health issues; and the children=s need
for stability and the stability offered by the Department=s plans
for the children to be adopted by their paternal grandparents, we conclude that
the trial court could have reasonably formed a firm belief or conviction that
termination of Mother=s parental rights was in the
children=s best
interests. Giving due deference to the trial court=s
determination, we hold that the evidence is factually sufficient to support the
trial court=s judgment that termination of
Mother=s
parental rights was in the children=s best
interests.  See C.H., 89 S.W.3d at
28.  We overrule Mother's second issue.

Conclusion

Having
overruled both of Mother=s issues on appeal, we affirm
the trial court=s order terminating Mother=s
parental rights to S.A.G., E.J.G., and N.S.G.

 

TERRIE LIVINGSTON

JUSTICE

 

 

PANEL:  LIVINGSTON, GARDNER, and
MEIER, JJ.

 

DELIVERED:  March 18, 2010











[1]See Tex. R. App. P. 47.4.





[2]To protect the privacy of
the parents and children involved in this appeal, we identify them by initials
only.  See Tex. R. App. P. 9.8(b);
Tex. Fam. Code Ann. ' 109.002(d) (Vernon
2008).





[3]We take judicial notice
that hydrocodone is Aa potent analgesic
derivative of codeine.@  Stedman=s Medical Dictionary 911 (28th ed. 2006); see
Tex. R. Evid. 201(b), (c) (stating that a court may take judicial notice of
adjudicative facts, including facts that are Anot subject to reasonable
dispute@ in that they are Acapable of accurate and
ready determination by resort to sources whose accuracy cannot reasonably be
questioned@).





[4]No evidence was
introduced regarding the administration of any formal IQ testing or any such
test=s results. 





[5]In March 2002, Mother
voluntarily relinquished her rights to her first child, born in November
2000.  In December 2002, Mother
voluntarily relinquished her rights to her second child, born in April 2002,
because Mother did not think that she could meet the child=s daily needs.





[6]The trial court did not
terminate Father=s parental rights.